IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08–cv–01569–RPM–KMT

DEBBIE SEME

 Plaintiff,

v.

E & H PROFESSIONAL SECURITY CO., INC. and
EAGLE HOMELAND SECURITY, INC.,

 Defendants.

_____

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

_____

**Kathleen M. Tafoya**
**United States Magistrate Judge**

 This matter is before the court on "Plaintiff's Motion for Rule 55(b)(2) Default

Judgment." (Doc. No. 33, filed September 18, 2009 [hereinafter "Mot."].) Plaintiff seeks a

default judgment for damages against Defendants E & H Professional Security Company, Inc.

(hereinafter "E & H") and Eagle Homeland Security, Inc. (hereinafter "Eagle").[1] "Plaintiff's

Evidence in Support of Default Judgment" was filed on October 19, 2009. (Doc. No. 38.)

Plaintiff filed supplementary exhibits and affidavits on October 19, 2009 (Doc. No. 39), October

_____

 [1] According to Plaintiff, Defendant E & H was voluntarily dissolved on October 25, 2007
(Compl., ¶ 6), and its name was changed to Eagle Homeland Security, Inc. (Doc. No. 38-2, ¶ 5
[hereinafter "Seme Aff."].) However, dissolution of a Colorado corporation does not "prevent
commencement of a proceeding . . . against the corporation in its name." Colo. Rev. Stat. §
7-114-105(2)(e).

21, 2009 (Doc. No. 44) and March 16, 2010 (Doc. No. 51). Additionally, evidence was adduced at a hearing on March 17, 2010.

## PROCEDURAL HISTORY

On July 24, 2008, Plaintiff filed the Complaint in this matter (Doc. No. 1 [hereinafter "Compl."]) alleging her rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (hereinafter "ADA"), and the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-301 *et seq.* (hereinafter "CADA"), were violated by Defendants. (Compl. at 8.)

Plaintiff served Defendant Eagle on January 22, 2009, and Defendant E & H on January 23, 2009. (Doc. Nos. 12, 13, 21, 22.) Pursuant to Fed. R. Civ. P. 12, a defendant must serve an answer within 21 days after being served with the summons and complaint. Fed. R. Civ. P. 12(a)(1)(A)(i). Defendants' answers were due on February 12, 2009, and February 13, 2009, respectively. On February 18, 2009, an Answer to the Complaint was filed by Connie Edwards, the professed owner of both corporations. (Doc. No. 14.) On April 2, 2009, this court struck the Answer because it was improperly filed by a non-attorney attempting to appear on behalf of corporate entity defendants. (Doc. No. 18; *see* Compl., ¶ 22); *see Tal v. Hogan*, 453 F.3d 1244, 1254 (10th Cir. 2006) ("a corporation must be represented by an attorney to appear in federal court.") Connie Edwards was Ordered to obtain counsel for the corporate defendants no later than May 1, 2009. (Doc. No. 18.)

There having been no entry of appearance by counsel for the defendants, on May 4, 2009, Plaintiff moved for entry of default against Defendants. (Doc. No. 20.) On May 7, 2009, the Clerk of Court appropriately entered default against Defendants pursuant to Fed. R. Civ. P.

55(a).  (Doc. No. 23.)  On August 3, 2009, Defendants were granted an extension of time up to and including September 17, 2009m within which to obtain counsel.  (Doc. No. 32.)  To date, no attorney has entered an appearance on behalf of either corporate defendant in this matter and no answer has been properly filed by an attorney.

Plaintiff's exhibits and affidavits in support of default judgment include: an Affidavit by Plaintiff  explaining Plaintiff's claims and calculation of damages (Doc. No. 38-2 ["Seme Aff."]); briefs and affidavits submitted by Plaintiff's counsel regarding their calculation of attorney fees (Doc. Nos. 38, 38-3, 38-5, 44, 44-2); and the Colorado Civil Rights Division (hereinafter "CCRD") and Equal Employment Opportunity Commission (hereinafter "EEOC") Charge of Discrimination Plaintiff filed against Defendants on November 17, 2007, and the Determination Rendered ("CCRD/EEOC Determination") (Doc. No. 39, and subparts).

## I.  *Legal Standard*

Default judgment may be entered against a party who fails to appear or otherwise defend pursuant to Fed. R. Civ. P. 55.  Pursuant to Fed. R. Civ. P. 55(b)(2), the court may enter a default judgment on a proper motion.  "[A] party is not entitled to a default judgment as of right; rather the entry of a default judgment is entrusted to the 'sound judicial discretion' of the court." *Cablevision of S. Conn., Limited P'ship v. Smith*, 141 F. Supp. 2d 277, 281 (D. Conn. 2001); *Deery Am. Corp. v. Artco Equip. Sales, Inc.*, 2007 WL 437762, at *2  (D. Colo. 2007).  Even after default, "it remains for the court to consider whether the unchallenged facts constitute a legitimate basis for the entry of a judgment" since a party in default does not admit conclusions of law.  *See McCabe v. Campos*, 2008 WL 576245, at *2 (D. Colo. 2008) (citing *Black v. Lane*,

22 F.3d 1395, 1407 (7th Cir. 1994)).  In determining whether a claim for relief has been

established, the well-pleaded facts of the complaint are deemed true.  *Vibe Tech., LLC v.

Suddath*,  2009 WL 2055186, at *1 (D. Colo. 2009) (citing *Dundee Cement Co. v. Howard Pipe

& Concrete Prod., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983)).  *See also DIRECTV, Inc. v.

Bloniarz*, 336 F. Supp. 2d 723, 725 (W.D. Mich. 2004) ("It is well-established that once a default

is entered against a defendant, that party is deemed to have admitted all of the well-pleaded

allegations in the complaint pertaining to liability.").  In addition, the court accepts the

undisputed facts set forth in the affidavits and exhibits.  *Id.*

## II.    *Jurisdiction*

### A.    *Service of Process*

"[W]hen entry of a default judgment is sought against a party who has failed to plead or

otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over

the subject matter and the parties" in order to determine whether it has the power to enter the

default judgment.  *Williams v. Life Sav. and Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986).

Plaintiff bears the burden of establishing personal jurisdiction.  *Intercon, Inc. v. Bell Atl. Internet

Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000).  "[P]laintiff need only make a *prima facie*

showing . . .[of jurisdiction] if the motion is decided only on the basis of the parties' affidavits

and other written materials."  *Dennis Garber & Assoc., Inc. v. Pack-Tech Intern. Corp.*, 115

F.3d 767, 773 (10th Cir. 1997).

This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331

(federal question).  Supplemental jurisdiction is proper over Plaintiff's CADA claim pursuant to

28 U.S.C. § 1367, as Plaintiff's ADA and CADA claims arose out of same transactions and incidents indicating they form part of the same case or controversy.

Although personal jurisdiction is a defense that is deemed waived by a party if not appropriately raised pursuant to Fed. R. Civ. P. 12(h)(1), "[d]efects in personal jurisdiction . . . are not waived by default when a party fails to appear or respond." *William*s, 802 F.2d at 1202. This is true because "[a] judgment is void when a court enters it lacking subject matter jurisdiction or jurisdiction over the parties." *Id.*; *V.T.A., Inc. v. Airco, Inc.*, 597 F.2d 220, 224–55 (10th Cir. 1979). Accordingly, "a district court must determine whether it has jurisdiction over the defendant before entering judgment by default against a party who has not appeared in the case." *Dennis Garberg & Assoc., Inc.*, 115 F.3d at 772.

A domestic corporation can be served properly by delivering a copy of the summons and complaint to "an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h). On January 22, 2009, Plaintiff effected service upon Defendant Eagle by leaving a copy of the Summons and Complaint with Defendant Eagle's registered agent, James C. Underhill, Jr., at 5340 S. Quebec Street, No. 306N, Greenwood Village, Colorado. (Doc. Nos. 12, 22.) On January 23, 2009, Plaintiff effected service upon Defendant E & H by leaving a copy of the Summons and Complaint with Defendant E & H's manager, Chris Dupont, at 7100 N. Broadway, No. 6-D, Denver, Colorado. (Doc. Nos. 13, 21.) Since both defendant corporations properly have been served, this court has personal jurisdiction over them. Furthermore, venue for this action is

proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b)(2)–(3) (venue is proper in the judicial district in which the defendant corporation is subject to personal jurisdiction).

### B. Exhaustion of Administrative Remedies

Finally, "the ADA requires a plaintiff to exhaust her administrative remedies before filing suit." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007). In the Tenth Circuit, "exhaustion of administrative remedies is a jurisdictional prerequisite to suit." *Id.* Under the ADA, a plaintiff is required to file a timely administrative charge within 300 days of any alleged discriminatory action. *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006). Here, the discriminatory action that forms the basis of this suit, Plaintiff's discharge, occurred on July 6, 2007. (Compl., ¶ 28.) Plaintiff filed her CCRD and EEOC Charge of Discrimination against Defendant E& H on November 19, 2007. (Doc. No. 39.) On March 25, 2008, the CCRD issued a Probable Cause determination in Plaintiff's case. (Doc. No. 39-2 at 7.) According to the undisputed facts in the Complaint, the CCRD issued a right to sue letter on April 28, 2008, and the EEOC issued a right to sue letter on May 28, 2008. (Compl., ¶ 17.) Plaintiff filed the Complaint in this matter on July 24, 2008. Since Plaintiff's administrative charges were filed within 300 days of her discharge and completed prior to filing suit in this court, Plaintiff has exhausted her administrative remedies.

### C. Written Notice

"If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing." Fed. R. Civ. P. 55(b)(2). Defendants have twice

sought to appear before this court without counsel.  The court has repeatedly informed Connie Edwards that corporations cannot appear through a non-attorney corporate officer, such as Ms. Edwards, appearing *pro se*.  (Doc. Nos. 18, 28); *see Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 556 (10th Cir. 2001).  Since no attorney has entered an appearance on behalf of Defendant companies and none of the appearances by Ms. Edwards before this court were proper, the court finds that Defendant companies have failed to appear pursuant to the Rules.  Accordingly, the seven day notice requirement of Fed. R. Civ. P. 55(b)(2) is inapplicable.

## III.     *Americans with Disabilities Claim*

Plaintiff's first cause of action is brought pursuant to Title I of the ADA.  *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 691 (2001) ("The ADA has three separate titles: Title I covers employment discrimination . . . . ").  Title I provides that covered entities shall not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1154 (10th Cir. 2008) (quoting 42 U.S.C. § 12112(a)).  "To establish a *prima facie* case of employment discrimination under Title I of the ADA, a plaintiff must show '(1) that [s]he is disabled within the meaning of the ADA; (2) that [s]he is qualified–with or without reasonable accommodation; and (3) that [s]he was discriminated against because of [her] disability.' "  *McKenzie v. Dovala*, 242 F.3d 967, 969 (10th Cir. 2001) (quoting *Aldrich v. Boeing Co.*, 146 F.3d 1265, 1269 (10th Cir. 1998)).

### A.      Covered Entity

To be liable for a claim under Title I of the ADA, the defendant must be "an employer, employment agency, labor organization, or joint labor-management committee" that employs the plaintiff.  Title 42 U.S.C. § 12111(2), (4); *McGuinness v. Univ. of N.M. Sch. of Med.*, 170 F.3d 974, 979 (10th Cir. 1998).  The ADA states, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, . . ."  42 U.S.C. § 12111(5).

Although the plaintiff does not set forth facts  in her Complaint to support her allegation that E & H was an employer within the definition of the ADA, in her unchallenged Affidavit she avers "[a]t all relevant times E & H and Eagle Homeland Security, Inc. had at least fifty employees."  (Seme Aff., ¶ 6.)  Plaintiff further alleges she was employed as a permanent part-time guard at E & H from August 14, 2006 to July 6, 2007, her date of termination.  (Compl., ¶¶ 52, 28.)  Therefore, Plaintiff has satisfied the preliminary showing of ADA coverage as to E & H.

Plaintiff alleges that Eagle was incorporated on October 24, 2007, months after she ceased working for E & H.  (Compl., ¶ 7.)  Plaintiff does not allege that she ever worked directly for Eagle, however claims that Eagle is a "successor corporation" to E & H for purposes of liability under the ADA.  (*Id.*)

The policy supporting the doctrine of successor liability when one company takes over another who is accused of wrongdoing is to protect an employee when ownership suddenly

changes.  *McKee v. American Transfer and Storage*, 946 F. Supp. 485, 48–88, (N.D. Tex. 1996).

Case law addressing this issue is not abundant, but suggests that liability of such a successor

employer must be determined on a case-by-case basis.  *Swanson v. University of Cincinnati*, 268

F.3d 307, 319 (6th Cir. 2001).  In determining whether successor liability should be imposed for

ADA violations, the critical factors to consider are whether: (1) the successor company had

notice of the charge or pending lawsuit prior to acquiring the business or assets of the

predecessor; (2) the predecessor company is able to provide relief; (3) there has been substantial

continuity of operations or operation of the same line of business; (4) the new employer operated

at the same location; (5) the new employer uses the same or substantially the same work force

and/or supervisory personnel; (6) the same jobs exist under substantially the same working

conditions; (7) the new employer uses the same machinery and equipment; (8) the members of

the boards of directors of the two corporations are similar; (9) advertisements directly link the

two corporations; and (10) the new corporation began its business just after the old corporation

closed its business.  *McKee*, 946 F. Supp. at 487–488; *Rojas v. TK Communications, Inc.*, 87

F.3d 745 (5th Cir.1996) (successor liability pursuant to Title VII.).  *See* 2 AMERICANS WITH

DISAB.: PRACT. & COMPLIANCE MANUAL: SUCCESSOR LIABILITY § 7:73, (2010).

Plaintiff alleges that E & H voluntarily dissolved on October 25, 2007, one day after

Eagle was formed on October 24, 2007.  (Compl., ¶¶ 6–7.)  Plaintiff also claims that after she

was "fired from E & H, the corporation changed its name to Eagle Homeland Security, Inc."

(Seme Aff., ¶ 5.)  At the hearing, Plaintiff testified that Jim Darling, a current employee of Eagle,

stated that E & H change the name of the company "to avoid being sued."  Plaintiff also testified

that the company still has contracts under the name E & H and that the name "Eagle Homeland" was chosen because it could still be referred to as E & H, the new company's initials.

Eagle and E & H were served at different locations—Eagle by leaving paperwork with registered agent James C. Underhill, Jr. and E & H by leaving paperwork with Manager Chris Dupont.  (See Doc. Nos. 21 and 22.)  Both corporations show the 7100 N. Broadway address as the business location as represented by owner Connie Edwards in her filings with the court.  (Doc. No. 29.)  During the proceedings in this case Connie Edwards appeared seeking redress from the court on behalf of both corporations and listed her address as 7100 N. Broadway, Denver, Colorado.  (Docs. No. 14, 26, 29.)

From the undisputed facts above, it appears Eagle is simply a new name or continuation of the same business as E & H.  Given the timing of the name change and the pending CCRD/EEOC charges brought by Plaintiff, together with evidence that Capt. Hymore coerced an E & H employee to lie about the plaintiff's termination around the same time period, the evidence that the name was changed to "avoid being sued" is credible.  Both companies have the word "Security" in their names, indicating that both are in the business of providing security services; both companies begin with the alphabetic letters E and H; and both were co-located at 7100 N. Broadway, Denver, Colorado and were represented by the same principal officer or owner, satisfying factors 3, 4, 5, and 6.  Whether the companies use the same equipment is not known and the court was not presented with documents from the Secretary of State which might have revealed the members of the board of directors of the two companies.  That the new corporation began its business one day before the old corporation closed its business favors a

finding of successor liability under factor 10.  The new company, Eagle, was not named in the underlying EEOC or Civil Rights claims and hearing; however the Determination on the charge was mailed to E & H Security at 7100 N. Broadway Blvd., Denver, Colorado on or about March 25, 2008, approximately six months after Eagle had been incorporated and took over the space from E & H, addressing factor 1.  As to whether the predecessor company can provide relief, the uncontested facts show that E & H was dissolved in October 2007, and the court notes that beginning in September 2009, all mail addressed to either E & H or to Eagle from the court has been returned as undeliverable (Doc. Nos. 36, 37, 46 and 47), leading to the conclusion that E & H appears unlikely to be able to provide relief to the Plaintiff.

Therefore, considering the uncontested facts and the factors regarding successor liability, the court finds that Plaintiff has properly included successor company Eagle as a defendant in this case.

### B.     *Disabled within the Meaning of the ADA*

A "qualified individual" with a disability is identified as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  In turn, a "disability" is defined by the ADA as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  Plaintiff alleges she "is a qualified individual with one or more disabilities," was "regarded as an individual with a

disability," and had "a record of a disability." (Compl., ¶¶ 3–5.) Therefore, Plaintiff alleges she

falls within all three definitions of disability under the ADA.

### i. *Physical or Mental Impairment Substantially Limiting a Major Life Activity*

To satisfy the first definition of disability under the ADA, a plaintiff must "(1) have a

recognized impairment, (2) identify one or more appropriate major life activities, and (3) show

the impairment substantially limits one or more of those activities." *Berry v. T-Mobile*, 490 F.3d

1211, 1216 (10th Cir. 2007). A physical or mental impairment includes any physiological

disorder or condition affecting the neurological, musculoskeletal, and respiratory systems. 29

C.F.R. § 1630.2(h)(1). Plaintiff alleges she suffers from asthma and also from seizures resulting

from an automobile accident in 1986. (Seme Aff., ¶ 2.)

Major life activities include "functions such as caring for oneself, performing manual

tasks, walking, seeing, hearing, speaking, breathing, learning, and working." C.F.R. § 1630.2(i).

Plaintiff has failed to identify any such major life activity that is substantially limited by either

her asthma or her seizure condition. Indeed, with regard to the major life activity of working,

Plaintiff states her condition never interfered with her ability to perform her job as Defendants'

employee. (Seme Aff., ¶ 12–14.) Therefore, Plaintiff has failed to allege a disability under

Section A.

### ii. *Record of Such an Impairment*

To satisfy the ADA's second definition of a disability, a claimant "may be deemed to

have a 'record' of a disability described in Section 12102(1)(A) either by having a history of

substantial limitation of a major life activity or by having been misclassified as having such an impairment." *Berry*, 490 F.3d at 1219 (citing 29 C.F.R. § 1630.2(k)).  As noted, Plaintiff has failed to identify a major life activity which was substantially limited by her conditions.  There are no facts showing Plaintiff was misclassified as having such an impairment.

### iii.    *Being Regarded as Having Such an Impairment*

An individual meets the requirement of "being regarded as having such an impairment" if

> the individual establishes that he or she has been subjected to an action prohibited
> under this chapter because of an actual or perceived physical or mental
> impairment whether or not the impairment limits or is perceived to limit a major
> life activity.

42 U.S.C. § 12102(3)(A).  "A person is regarded as disabled when (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Lanman v. Johnson County, Ks.*, 393 F.3d 1151, 1156 (10th Cir. 2004).

Here, Plaintiff alleges Captain Hymore, Plaintiff's supervisor (Compl., ¶ 32), "stated that Plaintiff was being fired because of her disability" (*id.*, ¶ 69).  Plaintiff further alleges Captain Hymore "rant[ed] about [P]laintiff's 'f***ing disability' " (profanity amended) and stated " 'we don't need people like that.' " (*Id.*, ¶ 65; Seme Aff., ¶ 23.)  As found by the Colorado Civil Rights Division,

> [t]he preponderance of the evidence demonstrates that Bill Hymore, Operations
> Manager, perceived the Charging Party's [Plaintiff herein] history of seizures as a
> limiting impairment that substantially limited her major life activities.  Not only
> did Hymore refer to her impairment as a 'f-ing disability;' but Connie Edwards,

Owner, believed that the Charging Party was not able to perform the duties of an armed security guard. Hymore mistakenly believed the Charging Party' [sic] seizures to be a substantially limiting impairment, so he discharged the Charging Party on July 6, 2007, claiming it was because she 'lied about her f-ing disability.'

(CCRD/EEOC Determination at 6.)

The uncontested evidence establishes that Defendants were of the opinion that Plaintiff's seizure disorder was a disqualification for employment as a security guard, in spite of the fact that Plaintiff had been successfully so employed since 1980. The court finds Plaintiff's allegations sufficient to establish the first element necessary to a *prima facie* case of employment discrimination under Title I of the ADA. *See McKenzie*, 242 F.3d at 969.

### C. *Qualified Individual*

A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Plaintiff alleges "Defendant indicated that Plaintiff's performance was fine." (Compl., ¶ 31.) Plaintiff claims "[n]o irregularity occurred during the performance of Plaintiff's duties due to her disabilities." (*Id.*, ¶ 49.) Plaintiff states she is "able to predict and delay the onset of a seizure," and that she "never experienced a seizure while on duty." (Seme Aff., ¶¶ 11–12.) Plaintiff states that she has worked in security since 1980 and had never been fired from any previous employment. (*Id.* ¶ 27.) Plaintiff states she was promoted to Private First Class Supervisor in November of 2006 in recognition of her satisfactory performance despite her asthma and seizure conditions. (*Id.*, ¶ 14.) Plaintiff maintains, "[t]here was simply nothing about my disability the [sic] prevented me

14

from doing this kind of work." (*Id.*, ¶ 14.) As noted, the Colorado Civil Rights Division agreed. (CCRD/EEOC Determination.) While the court notes "consideration shall be given to the employer's judgment as to what functions of a job are essential," 42 U.S.C. § 12111(8), Defendants' failure to set forth a defense other than as noted in the CCRD/EEOC Determination prevents this court from considering their judgment. Accordingly, the court finds that Plaintiff has presented facts indicating she could, and did, perform the essential functions of the position of armed security guard for Defendants' company, substantiating that she is a qualified individual within the meaning of the ADA.

### D. *Discrimination Based on Disability*

"[T]he term 'discriminate against a qualified individual on the basis of disability' includes . . . using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). To establish the final element of her *prima facie* case, Plaintiff must "present some affirmative evidence that disability was a determining factor in the employer's decision." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001) (citations and quotations omitted). Plaintiff must demonstrate that "her employer terminated her employment under circumstances giving rise to an inference that the action was based on her disability." *Id.*

Here, Plaintiff alleges she served as a PFC Supervisor for Defendants and had no prior history of substandard performance or misconduct.  (Compl., ¶¶ 28–31.)  Plaintiff claims Defendant learned of her seizure condition on June 29, 2007, when she notified Sabrina Scherbarth, Connie Edwards' daughter who is employed in Human Resources for E & H, that she was unable to work on June 29, 2007, due to having experienced a seizure while off duty at her home.  (*Id.*, ¶¶ 56, 57; Seme Aff., ¶15.)  Plaintiff stated that she was allowed to come back to work as scheduled beginning June 30, 2007, until another E & H employee apparently informed the client receiving the security services from E & H that Plaintiff was affected by a seizure disorder.  (Seme Aff., ¶¶ 16–19.)  Plaintiff claims she was thereafter removed from her position as a guard at that client location.  (*Id.*, ¶ 21.)  Plaintiff alleges that on July 6, 2007, she attended a meeting with Captain Hymore and Sergeant Reiber.  (Compl., ¶ 61.)  Plaintiff alleges Captain Hymore, Plaintiff's supervisor (*id.*, ¶ 32), "stated that Plaintiff was being fired because of her disability" (*id.*, ¶ 69).  As previously noted, Plaintiff further alleges Captain Hymore used profanity when describing Plaintiff's disability and followed the expletive with the comment "we don't need people like that."  (*Id.*, ¶ 65; Seme Aff., ¶ 23.)  Plaintiff affirms that she "was not offered an alternative position, nor were any efforts made to provide any reasonable accommodations."  (Seme Aff., ¶ 25.)

Although the defendants have not appeared in this litigation, as noted previously Plaintiff has submitted the findings of the CCRD and EEOC investigation which includes the Affidavit of Ada G. Reiber, a co-worker at E & H during the relevant time period.  ("Reiber Aff.," Doc. No. 39-4.)  During the CCRD investigation Respondent E & H asserted that Plaintiff was terminated

because she threatened two employees, one of whom was Capt. Hymore. (CCRD/EEOC Determination at 3-4.) The facts contained in the Reiber Affidavit clearly indicate that although Plaintiff did make a comment about the penalties associated with shooting the two employees who revealed Plaintiff's confidential medical information to the security client on or about June 29, 2007, the comment was made in jest between two friends. (Reiber Aff., ¶ 21.) The evidence reveals that beyond this one comment, there were no threatening actions undertaken by Plaintiff, she was allowed to continue working her shifts at E & H after the comment was made known, and no person felt seriously threatened by the Plaintiff's comment. In fact ,the evidence adduced during the CCRD/EEOC investigation indicates that Capt. Hymore of E & H actually was threatening the Plaintiff, using coarse profanity and threatening to have her arrested merely because she was waiting for her final paycheck to be processed while standing outdoors and off the premises of E & H. (CCRD/EEOC Determination at 4.) Later, the uncontested facts show the same Capt. Hymore threatened and bullied Affiant Reiber until she signed a document containing lies about the facts surrounding Plaintiff's termination in an attempt to keep the company from being "in trouble" with the CCRD after the discrimination charge had been filed. (Reiber Aff., ¶¶ 46, 48, 49.)

This court finds the facts and circumstances alleged to have existed at the time of Plaintiff's termination give rise to a direct inference that Plaintiff's termination was based on her disability. The unchallenged facts alleged in Plaintiff's Complaint and Affidavit establish a *prima facie* claim for disability discrimination under Title I of the ADA and, therefore, constitute a legitimate basis for the entry of judgment on Plaintiff's ADA claim against Defendants.

## IV.     *Colorado Anti-Discrimination Act Claim*

The second cause of action is brought pursuant to the CADA.  The CADA makes it "a discriminatory or unfair employment practice [f]or an employer. . . to discharge[] . . . any person otherwise qualified because of disability . . . ."  Colo. Rev. Stat. § 24-34-402(1)(a).  "The ADA and the CADA are, essentially, parallel statutory schemes that address disability discrimination." *Fleites v. Pueblo Med. Investors, LLC*, 07-cv-2658-REB-MJW, 2008 WL 4371924, at *1 (D. Colo. 2008).  The Colorado Civil Rights Commission Rules Prohibiting Discrimination on Account of Mental and Physical Disability, 3 COLO. CODE REGS. § 708-1, Rule 60.1, state

> Whenever possible, the interpretation of state law [the provisions of Parts 3 through 7 of Article 34 of Title 24, [Colo. Rev. Stat.] (1988), as amended] concerning disability shall follow the interpretations established in Federal regulations adopted to implement the Americans with Disabilities Act . . . and in the Federal case law interpreting the Americans with Disabilities Act . . . and such interpretations shall be given weight and found to be persuasive in any administrative proceedings.

3 COLO. CODE REGS. § 708-1, Rule 60.1(C).

To establish a *prima facie* case of discrimination under the CADA, Plaintiff must show: "(i) that the complainant belongs to a protected class; (ii) that the complainant was qualified for the job at issue; (iii) that the complainant suffered an adverse employment decision (e.g., failure to hire, failure to promote, discharge, or demotion) despite his or her qualifications; and (iv) that the circumstances gave rise to an inference of unlawful discrimination."  *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 400 (Colo. 1997).  "If the complainant establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision."  *Id.* at 401.

### A. Complainant Belongs to a Protected Class

The definition of "disability" under the CADA, like the ADA definition, includes "being regarded as having such an impairment."  Colo. Rev. Stat. § 24-34-301(2.5)(a).  The definition of "regarded as having such an impairment" includes having "a physical or mental impairment that does not substantially limit one or more major life activities but that is treated by another person as constituting such a limitation."  *Id.*, Rule 60.1(D)(1)(e).  Under the CADA, "major life activities" include working.  *Id.*, Rule 60.1(D)(1)(c).

As noted above, Plaintiff alleges Defendants informed her that her employment was terminated because they did not need individuals with seizure conditions as employees. (Compl., ¶ 65; Seme Aff., ¶ 23.)  Plaintiff has clearly alleged that Defendants treated her seizure condition as a limitation on her major life activity of working.  Plaintiff has sufficiently alleged she was regarded as having a disability and is, therefore, a member of the protected class of disabled individuals.

### B. Complainant was Qualified for the Job at Issue

For CADA purposes, a "qualified disabled person" includes "a person with a disability who, with reasonable accommodation, can perform the essential functions of the job in question."  3 Colo. Code Regs. § 708-1, Rule 60.2(B).  As noted above, Plaintiff alleges she has extensive experience as a security guard, her job performance while under Defendants' employ was satisfactory, and her seizure condition never interfered with her ability to perform the functions of her former job.  Accordingly, the court finds Plaintiff has sufficiently alleged she

can perform the essential functions of her former position and is, therefore, a qualified disabled person under the CADA.

### C.    Complainant Suffered an Adverse Employment Decision

Plaintiff alleges she was discharged from her employment on the basis of her disability. Pursuant to CADA, it is a discriminatory or unfair employment practice for an employer to discharge an otherwise qualified person because of their disability.  *See* Colo. Rev. Stat. § 24-34-402(1)(a).  Plaintiff has sufficiently alleged she suffered an adverse employment decision. *See Big O Tires, Inc.*, 940 P.2d at 401 (termination of employment constitutes an adverse employment action.).

### D.    Circumstances Give Rise to An Inference of Unlawful Discrimination

As noted above, this court finds the facts and circumstances alleged by Plaintiff suffice to raise an inference of unlawful discrimination on the basis of disability.

Since Plaintiff has stated a *prima facie* case for disability discrimination under CADA, and Defendants have failed to set forth a proper defense articulating a legitimate, nondiscriminatory reason for Plaintiff's termination, and since the facts presented do not remotely suggest any legitimate, non-discriminatory reason for the termination, this court reommends that default judgment be entered in favor of the plaintiff on all claims.

## V.    Damages

Default judgment cannot be entered until the amount of damages has been ascertained. *See Herzfeld v. Parker*, 100 F.R.D. 770, 773 (D. Colo. 1984).  Actual proof must support any default judgment for money damages where there is an uncertainty as to the amount.  *Klapprott*

*v. United States*, 335 U.S. 601, 611–12 (1949); *Top Rank, Inc. v. Fey*, 2009 WL 1384171, at *3 (D. Colo. 2009).

In the complaint, Plaintiff seeks damages for eleven categories of loss.  (Compl. at 9–10.) Her damages include lost wages, incidental costs associated with loss of employment, interest, costs of collection, liquidated damages, as well as seeks $100,000 in compensatory damages for alleged pain and suffering, emotional distress, mental anguish, loss of enjoyment of life, loss of consortium and inconvenience  (Compl., ¶ 93.I; Plaintiff's Evidence in Support of Default Judgment, Doc. No. 38 [hereinafter "Pl.'s Evid."] at 3–4), $100,000 in punitive damages for Defendants' alleged "reckless indifference" to her federally protected rights (Pl.'s Evid. at 8–9) and her attorney fees and other costs associated with prosecution and collection of the judgment (Compl. at 10).  In Plaintiff's Evidence in Support of Default Judgment and in Plaintiff's Updated Calculation of Damages (Doc. No. 51 ["Update"]), Plaintiff states she seeks judgment for : 1) Back Pay ; 2) Legal fees and costs; 3) Compensatory damages; 4) Punitive damages; 5) Miscellaneous damages 6) Pre and post judgment interest; 7) Front pay; 8) Tax liabilities; 9) Costs of collection; and, 10) Payment for all social security, tax adjustments and tax preparation costs to adjust for unpaid back taxes.

In ruling on a motion for default judgment, the court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment.  *Fanning v. Permanent Solution Industries, Inc.*, 257 F.R.D. 4, 7 (D.D.C. 2009).  Moreover, if Plaintiff's claim is not for a sum certain or a sum that can be made certain by computation, the court may

conduct hearings—preserving any federal statutory right to a jury trial—in order to determine the amount of damages. Fed. R. Civ. P. 55(b)(2).

The provisions of the ADA explicitly provide that the remedies available for its violation are those available under the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. 42 U.S.C. § 12117(a). *See also* 42 U.S.C. §§ 2000e-5, 2000e-6, 2000e-8, and 2000e-9. Remedies for intentional unlawful employment practices may include reinstatement with back pay, 42 U.S.C. § 2000e-5(g)(1). Also, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, outlines the damages available for cases of intentional discrimination under the ADA. The complaining party may recover compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses . . . ." 42 U.S.C. § 1981a(b)(3). Compensatory damages do not include back pay. 42 U.S.C. § 1981a(b)(2). A complaining party may seek punitive damages if the defendant discriminated "with malice or with reckless indifference to the federally protected rights of [the plaintiff]." 42 U.S.C. § 1981a(b)(1). *See Hogue v. MQS Inspection, Inc.*, 875 F. Supp. 714, 724 (D. Colo. 1995).

## A.    *Wages*

"A district court's decision to award back or front pay under the ADA is an equitable one." *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 910 (10th Cir. 2004) (citing 42 U.S.C. § 2000e-5(g)(1) (Relief "may include . . . back pay . . . or any other equitable relief as the court deems appropriate[.]"). "As an equitable consideration, 'a district court has broad discretion in fashioning relief to achieve the broad purpose of eliminating the effects of

discriminatory practices and restoring the plaintiff to the position that she would have likely enjoyed had it not been for the discrimination." *Id.* at 910–11 (quoting *Dilley v. SuperValu, Inc.*, 296 F.3d 958, 967 (10th Cir. 2002)).

"If the court finds that the respondent has intentionally engaged in . . . an unlawful employment practice charged in the complaint," the court may order back-pay. 42 U.S.C. § 2000e-5(g)(1). "Interim earnings or amounts earnable with reasonable diligence by the person . . . discriminated against shall operate to reduce the back pay otherwise allowable." *Id.* Back pay is an authorized form of damages under the ADA. *See* 42 U.S.C. §§ 2000e-5(g), 12117(a); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975). The decision to award back pay lies in the court's equitable discretion. *See E.E.O.C. v. General Lines, Inc.*, 865 F.2d 1555, 1558 (10th Cir. 1989). "A prevailing ADA claimant is presumptively entitled to all back pay which would have accrued from the termination date to the entry of judgment." *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 15 (1st Cir. 1999) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421–22 (1975)). The plaintiff must, however, show that "reasonable diligence [was exercised in the effort to secure] other suitable employment." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32 (1982); *see Quint*, 172 F.3d at 16.

Plaintiff seeks $30,560.00 in lost wages she claims she would have earned between August 7, 2007 and March 17, 2010. (*See* Pl.'s Evid. at 2; Doc. No. 39-5 at 1; Doc. No. 51 ¶ 1.) With regard to the preliminary showing of reasonable diligence to secure alternate employment, Plaintiff affirms that

> Since July 2007 I have diligently sought other employment, without success. I applied to six security companies in the greater Denver area but did not receive even one response. I called every security company listed in the Denver metro-area and applied in person at each place that said they were taking applications.

(Seme Aff., ¶ 26.) At the hearing, Plaintiff stated that she has called and applied to Barton, Advantage, Wackenhut, APG, Arco and other security companies consistently for the past two and one-half years. She stated she telephones and asks if any entity is hiring, and if told yes she submits an application either in person or on the internet. However, the plaintiff claims that once she reveals she has been fired from a position, she does not receive any further consideration. The plaintiff has stated she has not looked for or applied for any job not in the security field because she needs to be able to leave a specified post and walk around to calm herself if she feels a seizure coming on and feels this requirement eliminates a number of other employers.

Plaintiff claims she earned wages at a rate of $10 per hour and worked an average of 19 hours per week. Thus, Plaintiff's gross income per week was $190. There are 139.5 weeks between August 7, 2007 and March 17, 2010. Plaintiff's $30,560.00 lost wages figure is derived from multiplying Plaintiff's gross income of $190 per week by the 139.5 weeks she was allegedly unemployed after Defendants terminated her and adding in the lost FICA payments of $4,055.00 (15.3% of gross wages).

Plaintiff has submitted five pay stubs detailing her compensation from Defendant E & H for four pay periods. She claims she is only in possession of these limited documents and that the defaulting defendants are in control of the remainder of the pay records. From December 25, 2006 to January 7, 2007, Plaintiff worked 25 hours; from April 30, 2007 to May 13, 2007,

Plaintiff worked 51.25 hours; from June 11, 2007 to June 24, 2007, Plaintiff worked 82.5 hours; and from May 14, 2007 to May 27, 2007, Plaintiff worked 28.5 hours. (Doc. No. 39-5.) Based on these figures, Plaintiff worked an average of 23.4 hours per week. However, Plaintiff was employed by Defendants from August 14, 2006 to July 6, 2007 (Compl., ¶¶ 52, 28), or a total of approximately 47 weeks, and affirms that her average work week during the entire period was 19 hours per week. (Seme Aff., ¶ 4) The court therefore finds that the plaintiff is entitled to an award of $30,560.00 as back wages. The plaintiff, had she not been terminated and had worked at her normal frequency and rate of pay, would have been required to pay normal taxes on these wages and that the fact that she will be taxed on this amount if recovered from the defaulting defendants does not merit any award for tax liability as requested by the Plaintiff in her "Updated Calculation of Damages" ("Update").

The court may, in its discretion, award pre-judgment interest on Plaintiff's back pay award. *See Daniel v. Loveridge*, 32 F.3d 1472, 1478 (10th Cir. 1994). Such an award may, in appropriate cases, further the remedial purpose of the ADA to make plaintiffs whole. *See id.* Because the federal statute on interest addresses post-judgment interest and is silent as to pre-judgment interest, setting the rate for pre-judgment interest is in the discretion of the district court. *See* 28 U.S.C. § 1961; *Smith v. Am. Int'l Life Assurance Co.*, 50 F.3d 956, 958 (11th Cir. 1995). Plaintiff claims in her Update that the current fifty-two week T-Bill rate controlling post judgment interest is at 0.41 percent. (Update at n.1.) The court is unpersuaded by the "draft" submission tendered by the Plaintiff that argues "prejudgment interest should be calculated using the defendant's unsecured, short-term borrowing rate" as the appropriate rate of interest

calculation.  *See* Michael S. Knoll, (DRAFT) *The Calculation of Prejudgment Interest*, Scholarship at Penn Law (May 31, 2005), http://lsr.nellco.org/upenn_wps/120.

The court, therefore, recommends an award to Plaintiff of pre-judgment interest on the back pay award accruing beginning August 7, 2007, until entry of judgment, at the rate of 0.41%.

The plaintiff also seeks a front pay award of damages.  To date, the plaintiff has been unemployed for a period of 139.5 weeks, or over two and one-half years.  She has not considered a job in a new field for which she might have been able to find employment at a rate of $10.00 per hour.  Although mail to both E & H and Eagle has become undeliverable and Ms. Edwards is no longer attempting any contact with the court on this case, the Plaintiff presented credible evidence at the hearing that Eagle continues in operation at a new location.

The central purpose of the ADA is to make the plaintiff whole; to restore the plaintiff to the economic position the plaintiff would have occupied but for the illegal discrimination of the employer.  *Davoll v. Webb*, 194 F.3d 1116, 1143 (10th Cir. 1999); *see also Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1338 (11th Cir. 1999).  While reinstatement is the best way to achieve the ADA's central purpose where discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy, a trial court may award a plaintiff front pay in lieu of reinstatement.  *Id.*

Under the circumstances of this case, this court does not find that an award of front pay damages is warranted.  After the passage of this amount of time and given the low rate of hourly pay associated with her previous employment as a security guard, the plaintiff should be able to find other suitable part time work if she had attempted to look "outside the box."  The fact that

plaintiff cannot find employment two and one-half years after the termination in this case is likely a product of a sluggish economy and increased cost cutting on the part of businesses who might be inclined to employ security guards from a third party vender such as E & H. Therefore, this court does not recommend a judgment containing an award for front pay.

### B. Other future pecuniary damages

Plaintiff seeks an unspecified amount of damages for "costs that will be expended to collect the default judgment including reasonable attorney fees in pursuit thereof." (Pl.'s Evid. at 8.) Plaintiff has suggested that attorney fees associated with this collection effort will be 33-1/3% of the money collected. This calculation ignores the calculation of attorney's fees set forth herein in Subsection D. Additionally, the plaintiff requests $1,100.00 for the cost of an investigator to work ten hours at $100.00 per hours to trace the Defendants' assets. At the hearing, the plaintiff stated she still had at least one friend with whom she had communicated within the last two days whose son was working at Eagle. She listed various assets she was aware were held in the name of either E & H or Eagle. This court believes a reasonable amount to be awarded as the future costs of collection is five hours of attorney time and five hours of investigator time, for a total of $1,750.00.

Plaintiff seeks $6,000 to compensate her for losses sustained "by having to cash in entire savings." (Pl.'s Evid. at 8.) Plaintiff has failed to explain the basis of this claim for damages or to set forth legal authority for this award of damages. Therefore, no recommendation is made for payment of this sum.

Plaintiff seeks $600.00 for payment to a professional to help with all social security, tax adjustments and tax preparation to adjust for unpaid back taxes "on front pay awarded, and any taxable portion of compensatory and punitive damages." (Update, ¶ 10.) The court does not find this expense to be reasonable in light of the recommendation that no front pay be awarded. Tax preparation would have been the plaintiff's responsibility even if the wrongful actions had not resulted in her early termination. Therefore, this court does not recommend an award be made for these damages.

## C.    *Compensatory Damages*

In an action brought under Title I of the ADA, "the complaining party may recover compensatory and punitive damages." 42 U.S.C. § 1981a(a)(2). Plaintiff seeks $100,000 in compensatory damages for alleged future pecuniary losses, pain and suffering, emotional distress, mental anguish, loss of enjoyment of life, loss of consortium and inconvenience. (Compl., ¶ 93.I; Pl.'s Evid. at 3–4.) Compensatory damage awards under the ADA are subject to statutory caps based on the size of the employer. 42 U.S.C. § 1981a(b)(3). The statute provides,

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party . . . in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year[] [is] $50,000."

42 U.S.C. § 1981a(b)(3)(A); *See* Seme Aff., ¶ 6 ("At all relevant times[,] E & H and Eagle had at least 50 employees."). Eagle is liable, as discussed previously, only as a successor in interest to E & H, having had no dealings at all with the plaintiff in its own right.

28

At the hearing, Plaintiff testified that E & H had approximately 55 employees except for isolated occasions such as "Cinco de Mayo" and the Fourth of July when outside help was solicited to patrol. Counsel for Plaintiff conceded that this isolated inflation of employees would not satisfy the requirement of more than 101 employees in each of 20 or more calendar weeks, and that the appropriate cap in this case on compensatory and punitive damages is $50,000.000.

A plaintiff must show intentional discrimination to be entitled to compensatory damages in an ADA suit. *See Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999). "[I]ntentional discrimination may be inferred when a policy maker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy . . . ." *Id* . (citation and internal quotations omitted).

In evaluating non-economic damages, this court starts with the seminal case *Wulf v. City of Wichita*, 883 F.2d 842, 874 (10th Cir.1989). The court found in *Wulf* that during the trial the plaintiff had testified that his termination was "very stressful," and that his wife testified that plaintiff was under "tremendous emotional strain" and that they experienced financial difficulties as a result of the employer's actions. *Wulf*, 883 F.2d at 875. The Tenth Circuit found that this evidence was sufficient to warrant an emotional distress award, but further found that an award in the amount of $250,000 from the jury was excessive. *Id*. The Tenth Circuit compared the compensatory award with recent rulings from other circuit courts upholding compensatory damage awards in discrimination cases involving similarly limited evidence of emotional distress — a condition from which this plaintiff also suffers —  in reducing the award to

$50,000. *See also Clawson v. Mountain Coal Co., L.L.C.*, 01-cv-2199-MSK-MEH, 2007 WL 4225578, at *4-5 (D. Colo. Nov. 28, 2007)(discussing *Wulf*); *McDonough v. City of Quincy*, 452 F.3d 8, 22 (1st Cir. 2006) (award of $300,000, most of which reflected emotional distress, was not excessive where the plaintiff was "humiliat[ed]" by his termination, felt that his reputation had been damaged, and observed that it caused his relationship with his family to suffer, but resulted in no long-term physical symptoms or need for medical treatment.); *Eich v. Board of Regents*, 350 F.3d 752, 763-64 (8th Cir.2003) ($200,000 compensatory award upheld even though the only cited evidence of emotional distress was the plaintiff's testimony that she was "frustrat[ed]" and "devestat[ed]" by the employer's conduct.); *Knight v. Metropolitan Govt. of Nashville*, 136 Fed. App'x 755, 762 (6th Cir.2005) (unpublished) ($150,000 emotional distress award not excessive where plaintiff suffered emotional distress, financial hardship, and reduced standard of living after termination). The Tenth Circuit, in *Powell v. COBE Laboratories, Inc.*, 98-1350, 98-1363 2000 WL 235241 (10th Cir. Mar. 2, 2000), affirmed a trial court's reduction of an emotional distress award in a sex discrimination case from $300,000 to $50,000, finding the evidence at trial parallel to that discussed in *Wulf*, and concluded that the same reduction to $50,000 should be imposed there. *Id.* at *9.

District Judge Walker Miller has recently stated that in evaluating an award of compensatory, non-economic damages a court should consider "the following factors: (1) the nature and severity of the conduct violating the plaintiff's rights; (2) the nature and extent of the harm suffered by the plaintiff; (3) whether medical or other healthcare assistance was sought; (4) whether the plaintiff could continue to work in his chosen field; (5) the context or circumstances

of defendant's acts; and (6) corroborating, objective evidence." *Blangsted v. Snowmass-Wildcat Fire Protection Dist.*, 642 F. Supp. 2d 1250, 1257 (D. Colo. 2009) (citing *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416-17 (10th Cir.1997) (upholding a $200,000 award in a sexual harassment case)).  Judge Miller also noted that a multiple factor of 3 times the award of damages of lost wages is common in the Tenth Circuit.  *Id*. at 1258.

The plaintiff has stated that she was emotionally distraught subsequent to her firing (Seme Aff., ¶ 30), that she is lonely without the camaraderie of a workplace, and that her actual firing was embarrassing, degrading and threatening.  (*Id.*, ¶ 32a-b.)  She claims she has experienced more seizures than was normal for her prior to her firing because of the stress of her termination.  (*Id.*, ¶ 32d.)  She claims she has become withdrawn, feels worthless and suffers from insomnia.  (*Id.*, ¶ 32e-f.)  Plaintiff claims her self-esteem has suffered.  (*Id.*, ¶ 32f-g.)  She claims the "whole experience has left [her] very shaken emotionally."  (*Id.*, ¶ 32k.)  At the hearing, Plaintiff  further stated that because she had more frequent seizures causing her right arm to "fling," she ended up having surgery on her right arm and shoulder.  She claims she now cries more than she ever did before and that she is very stressed because of her inability to pay her bills and her constant worry.

I recommend, therefore, that Plaintiff be awarded compensatory damages in the amount of $50,000.00, the statutory maximum.

### D.    *Legal Fees to Prosecute this Action*

Plaintiff seeks $26, 602.24 in attorney fees and costs.  (*See* Pl.'s Evid. at 3; Doc. Nos. 38-3, 38-5, 44-2. and Update,¶ 3.)  In an action under the ADA, "the court . . . , in its discretion,

may allow the prevailing party, . . . a reasonable attorney's fee, including litigation expenses, and costs." 42 U.S.C. § 12205; *see Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 601 (2001). When considering a claim for attorney's fees, the moving party bears the burden of proving his entitlement to an award, as well as the appropriateness of the hours expended and the hourly rate sought. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Once the Plaintiff carries the burden of establishing an appropriate amount of hours spent and a reasonable fee, those numbers are used to generate a "lodestar" amount. *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1257 (10th Cir. 2005); *Robinson v. Edmond*, 160 F.3d 1275, 1280–81 (10th Cir. 1998). The lodestar figure is determined by multiplying the hours Plaintiff's counsel reasonably spent on the litigation by a reasonable hourly rate. *Id.* The lodestar is a presumptively reasonable fee award, taking into account most of the factors that bear on the reasonableness of the award, and thus, adjustments to the lodestar should only be made in rare and exceptional cases. *Pa. v. Del. Valley Citizens Council for Clean Air*, 478 U.S. 546, 564–65 (1986).

The court determines a reasonable hourly rate based on the parties' submitted evidence of market data showing rates charged by attorneys of comparable skill and experience in the area. *Case v. Unified School Dist.*, 157 F.3d 1243, 1256 (10th Cir. 1998). While Plaintiffs' attorneys has not provided the court with market date *per se*, their affidavits assert the hourly rate charged in Plaintiff's case is within the range of rates charged by attorneys of comparable skill and experience in the Denver, Colorado area. (Doc. No. 44-2, ¶¶ 5–8; Doc. No. 38-3, ¶¶ 4–5; Doc. No. 38-5, ¶¶ 3, 5.) The rates charged by Plaintiff's counsel appear to be at the lower end of the

ranges provided.  Accordingly, the court finds the hourly rates charged by Plaintiff's counsel reasonable.

Next, the court awards attorney's fees only for those hours that were reasonably expended on the litigation, and the burden is on Plaintiff to demonstrate that her counsel used "billing judgment" in winnowing down the hours actually spent to those reasonably expended. *Praseuth*, 406 F.3d at 1257.  The court will not award fees for time spent by counsel that was excessive, redundant, or otherwise unnecessary.  *Robinson*, 160 F.3d at 1281.  In assessing the reasonableness of claimed hours, the court considers numerous factors, including, but not limited to, whether the tasks for which compensation is sought are those that would normally be billed to a paying client, the complexity of the case, the number of reasonable strategies pursued, the aggressiveness of the other side, duplication of effort by multiple counsel, and the clarity with which time spent is recorded and allotted to specific tasks.  *Id.*  Ultimately, the court's goal is to fix a fee that would be equivalent to what the attorney would reasonably be able to bill for those services in an open market.  *Id.*

The three attorneys involved in this case submitted affidavits of their legal fees and costs and updated those affidavits in their recent submissions.  [Doc. No. 51.]  While the court does not agree with the need for three attorneys to prosecute this rather straightforward case, if the services of each attorney do not overlap there is no unreasonableness in awarding fees for the portion each attorney worked on.

This court finds that the $250.00 hourly rate charged by Jim Abrams and Elisa Moran is reasonable for attorneys of comparable experience in the Denver, Colorado area as is the

$175.00 hourly rate of Johanna Brammer-Hoelter.  This court finds that the hours billed by Johanna Brammer-Hoelter were reasonable and necessary to her work for the plaintiff, and were not duplicative of any other attorney's work, and therefore recommends an award to Ms. Brammer-Hoelter of $4,725.00 in fees and $113.75 in costs.

The affidavits in support of fees for Mr. Abrams and Ms. Moran contain many entries reflecting review of other counsels' work and for email communications between these three consulting attorneys.  This court finds those fees not to be reasonable and necessary. Additionally, Mr. Abrams requested compensation for 52.75 hours worked in his original affidavit; however the submission only contains entries for 41 hours.  This court finds that 9 of the 41 hours were duplicative of other work or involved consultation with the other attorneys on the case, including an excessive 9 hour request to gather his own billing records.  Mr. Abrams also requested an additional two hours of compensation to attend the hearing on March 17, 2010. This court therefore recommends an award to Mr. Abrams of 34 hours of attorney time for a total of $8,500.00 in fees and $350.00 in costs for an advance on the filing fee.  Ms. Moran's affidavit and the additional hours submitted in the Update, suffered from billing for consultations and emails between the three attorneys on the case for over 8.2 hours of the 32.2 for which she requests reimbursement.  Therefore, this court recommends that Ms. Moran be awarded fees for 24 hours of work, for a total of $6,000.00.  Given the many discussions prior to filing the case with James Underhill and others in an attempt to settle the case prior to filing, and the suggestion of fraudulent transfers, asset hiding and other improprieties faced by the plaintiff's attorneys, the total fee award of $19,225.00 is not excessive for this point in the litigation.

### E.  Punitive Damages

Plaintiff seeks $100,000 in punitive damages.  "A complaining party may recover punitive damages under this section against a respondent . . . if the complaining party demonstrates that the respondent engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  Like compensatory damages, punitive damages in ADA claims are capped at $50,000 since Defendants are alleged to have employed approximately 55 employees.  *See* 42 U.S.C. § 1981a(b)(3)(A).

"An ADA plaintiff may seek punitive damages if his employer acted with 'malice or with reckless indifference to the plaintiff's federally protected rights.' "  *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 914 (10th Cir. 2004) (quoting *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 535 (1999)).  Neither "malice" nor "reckless indifference" is defined in the ADA or in the Civil Rights Act of 1991.  *Hogue*, 875 F. Supp at 725.  "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages."  *Kolstad*, 527 U.S. at 536.

To sustain an award of punitive damages for discrimination in violation of federal civil rights, a plaintiff must prove that the discrimination was "malicious, willful, and in gross disregard of [plaintiff's] rights."  *EEOC v. Gaddis*, 733 F.2d 1373, 1380 (10th Cir.1984).  Proper considerations in punitive damages cases include "an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent."

*Hogue*, 875 F. Supp. at 725 (quoting *Miller v. City of Mission, Kan*., 705 F.2d 368, 377 (10th Cir.1983)).

Here, Plaintiff alleges Defendants failed to train or discuss discrimination law with their employees. (Pl. Evid. at 5–8.) It is obvious from the evidence that if Capt. Hymore was ever provided ADA training, he was either in a coma during the training or has suffered amnesia since. Plaintiff alleges "she was yelled at, cursed, and terminated in foul language denigrating her disability." (*Id.* at 7.) Plaintiff has alleged Defendants acknowledged her termination was the result of her disability. In *Hogue*, the plaintiff was subjected to a comment similar to the offensive language in this case, "we can't have this shit." The court found the single comment, referencing the plaintiff's EEOC discrimination complaint rather than her actual disability, to be insufficient to support a claim for punitive damages.

In this case, however, defendants went far beyond even the crass and untenable language used in the termination of the plaintiff, but also coerced another employee to lie to the CCRD/EEOC investigators, threatened the plaintiff with criminal trespass sanctions while she simply awaited her final paycheck, and interfered with her ability to gain other employment. It is clear that the company and its employees acted in reckless disregard to the Plaintiff's rights as a disabled person. Therefore, this court recommends an award of punitive damages of $50,000.00, the statutory maximum.

**WHEREFORE**, for the foregoing reasons, the court respectfully

**RECOMMENDS** that "Plaintiff's Motion for Rule 55(b)(2) Default Judgment" (Doc. No. 33) be **GRANTED** and that default judgment be entered in favor of Plaintiff on all claims and that damages be awarded consistent with the findings herein.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579–80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule");  *One Parcel of Real Property*, 73 F.3d at 1059–60 (a party's objections to the Magistrate Judge's report and

recommendation must be both timely and specific to preserve an issue for *de novo* review by the District Court or for appellate review);  *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 19th day of March, 2010.

**BY THE COURT:**

_____
Kathleen M. Tafoya
United States Magistrate Judge